Good morning, Your Honor. Jason Carr appearing on behalf of Petitioner Johnny Lee Davis. I intend to reserve a minute or two of my time for rebuttal if the courts leave. Alrighty. This case presents the question of whether or not a defendant has a right to effective assistance of counsel in its sentencing. Pull the mic up a little bit. Thanks. The stake intends that the defense attorney, that their role in the defense is done at the time of change of plea, negotiate a favorable plea agreement, and wipe her hands of the case and walk away. This case presents a good vehicle for exploring this question because we do have a stark contrast in this case between counsel's performance at the negotiation of the plea agreement versus counsel's performance at sentencing. Here, defense counsel negotiated a favorable plea for her client. The client took the plea. He entered it. We aren't challenging the plea agreement here. We take no umbrage with counsel's performance up to the time of entry of plea. But what happened at sentencing, it stands in stark contrast. Now, this plea agreement, and the court will find it, it begins on the excerpt from records on page 38, negotiated a cap of the sentencing of 6 to 15 years. In Nevada, the low-end term has to be 40% of the high-end term. So, they negotiated a cap of 6 to 15 years where the state was free to argue at sentencing. Now, what this plea agreement, the plain language of the plea agreement implies is that if the state is free to argue to the cap, defense counsel is free to argue for something lower than the cap. Under Nevada law, there's a variety of things you could have done. You could have kept the 15-year cap for the expiration of the term in place and argued for a lower parole eligibility terms. They argued for two terms of 2 to 15 or something along those lines. Here, the state was free to argue, and by way of negative implications, so was the defendant. At change of plea, we don't see any alteration of that agreement. The agreement is put in as entered. What happens at sentencing, though, is curious. The prosecutor gets up and makes an impassioned plea that goes on for pages about why the judge should impose the maximum sentence under the plea agreement, impose the cap sentence of 6 to 15. And then on page 50 of the excerpt for record, we see defense counsel say something that's quite curious. Okay, there's no dispute about the fact he misstated the plea agreement. Your Honor, I guess the state could dispute that perhaps there was a secret agreement that was negotiated. No, no. I mean, the defense lawyer misstated the agreement. That would be our contention, yes, Your Honor. I think everybody understands that. But the agreement itself was before the judge, and the correct terms of the agreement were in the pre-sentence report. That's correct. So, okay. So what's the harm? Well, the harm here is, Your Honor, is, well, what the Court is saying essentially is that we have deficient performance, which is part of the one, part one of the Strickland prong, and also what the magistrate court found here in its report and recommendation. So we can focus our attention on prejudice. To show prejudice, I have to show a reasonable probability that but for counsel's deficiencies, the result may have been different, in this case, the result being that my client had received a more favorable sentence. Now, a reasonable probability is not a high standard. If you look directly to the Seminole case here, Strickland, the Court grapples with the question of what kind of standard are we going to mandate for showing a prejudice. And the Court specifically rejects a more likely-than-not standard. So I don't even have to show by 50-50, by preponderance of the evidence, that it's more likely that my client would receive a favorable sentence. What should the lawyer have done that he didn't do specifically? Well, Your Honor, I would submit here that what we can glean from the record here is a fairly large body of mitigating evidence. Wasn't that also in the presentence report? No, Your Honor. It wasn't. Some of it was to some degree, but it's presented in kind of a – there's some mitigating facts floating around out there that could be gleaned by the judge if you were to look behind the scenes. But a perfect example is when the presentence report talks about, which I submitted under seal to the Court, about significant mental health information. And the report says, yes, according to the defendant, he's being treated by a psychiatrist and taking prescribed medication while incarcerated at the Clark County Detention Center. That's what the report says. But what's – the reality here is a much more compelling and coherent narrative had defense counsel wished to present it. And what we know from the evaluation that was done for competency purposes in the court, which is contained on pages 35 and 37, is we have an individual who was suffering from mental health problems, significant mental health problems, for quite a long period of time. He suffered – arguably suffered from organic brain damage. The psychiatrist notes a accident that occurred when the defendant was two years old, which according to him, after that, his head was messed up after that accident. We have somebody suffering from command hallucinations, who's self-medicating on drugs. The report indicates that he has not had more than three or four hours of sleep for many years before the commission of this offense. And the author opines that that would – could exacerbate any mental health problems. And we're not talking here about run-of-the-mill depression. Not that I want to mitigate the severity of depression. It's a serious ailment. But we're talking here about full-blown schizophrenia, experiencing command auditory hallucinations, telling my client to go out and harm and kill people. And that's here in this record. And then the reports from the jail that I was able to acquire during this litigation show that he was not on one, two, three, but four different kinds of antipsychotropic medication after his intake into the jail. And I can tell the court that at our local jails, which are very overcrowded, partly because of the growth of Las Vegas, that it's very difficult to receive medical attention in jail. But here, after my client put in these desperately worded kites, he actually was seen by experts and prescribed a pretty healthy dose of psychiatric medication. There's also in the original report on 35, pages 35 and 37 of the record, talk about a traumatic childhood. Now, that has never been fleshed out at all in this case. We don't know exactly what this traumatic childhood was, whether he was referring to the trauma of trying to grow up while suffering from this organic brain damage, or abuse from his parents, or just mainly growing up in extremely poor, the hardships that could come from growing up in poverty. It's not entirely clear. And one common theme throughout this record is just the lack of any factual development. Now, at the state court level, there was no evidentiary hearing granted, Mr. Davis. So he was not able to substantiate, or flesh out, or supplement his factual allegations. But the Nevada Supreme Court, in their order dismissing the appeal, faults Mr. Davis for presenting only conclusory facts without any supporting kind of evidentiary materials. And it seems incongruous for the state to say, no, Mr. Davis, you may not have an evidentiary hearing. On the other hand, we're going to deny your petition because you didn't flesh out the facts fully enough. And another thing that the Nevada Supreme Court did, and this is important for the EDPA standards, is the Nevada Supreme Court, part of the basis for their decision, is this belief that the sentence was stipulated to you by defense counsel. You can see it's directly in the Nevada Supreme Court decision. Now, we know that that could be a clearly erroneous interpretation of the facts, or application of the facts to the law, which falls right under the 2254-G2 standard here. Because, as the court has already observed, the sentence was not stipulated to you. The defense is free to argue and to present a case for their client. Now, case law supports this notion that there probably is no more compelling mitigating evidence than evidence of a serious psychiatric ailment on the part of a defendant. And for good reason. If you are suffering from such a severe chemical imbalance that you're having auditory hallucinations telling you to go out and kill people and to engage in antisocial behavior, well, that cuts right to the heart of free will. Now, I would concede here that we have a case that is heinous in its implementation, that caused great harm to a citizen, the mother of my client's children. But another part of the story that was never presented was the way that she manipulated this individual who has a serious psychiatric problem. Now, this, and the defense counsel never presented this evidence to the court, but what I can glean from the discovery in the record here, was this individual has claimed my client for many years to extract every dime that she could from him, essentially as a con artist. And he had it and blew up and engaged in this violent episode. Now, I don't sanction that or excuse that by any means. But one of the primary defense functions, at least in my estimation, is to come forward to the court and tell your client's story. Tell his history and characteristics, explain his motivations, humanize him, and present to the sentencing judge, which is one of the most difficult decisions a judge can make, I think. What are we going to do with this individual? Present his side of the story, because you can darn well bet the state's going to do it. In this case, that was not done. My client did not receive a fair sentencing hearing, and I'd like to preserve my remaining 45 seconds for rebuttal. You got it. Thank you, Mr. Carr. Good morning, Your Honor. Vic Schulze for the Nevada Attorney General and the warden in this case. I think probably the most appropriate starting point here is the report and recommendation by the magistrate that was adopted by the judge below, the district court judge below. And the most important finding in that report and recommendation was that Mr. Davis had not shown that the result of the sentencing hearing would have been different. Had this mental health evidence been presented to the court, one important, I would say one vital issue that was found in that report and recommendation, as the court has recognized today, is that the sentencing judge, Judge Gates, had the majority of that information before him. But counsel, isn't there realistically a difference between having the dry report and having the kind of spirited explanation that opposing counsel was alluding to, particularly where here it was more than not saying anything. It was actually saying something affirmatively harmful to his client. That is, well, yeah, we've agreed to 15 years. I mean, what sentencing judge is going to say, no, no, that's too much? I mean, whereas if someone says, well, you have this range of 6 to 15, and I'd like to talk to you about why 6 is where this should go, why couldn't that have made a difference? I think to some extent, and I'm speculating to some degree, but I think to some extent a lot of that information would have come in in the form of reports, and I think it may have been as dry as it is in the EOR. To the extent that counsel could have presented that, I don't know. I don't know. Some of that might have been delivery. Some of that might have been the personal presentation that counsel made. And I can't speculate as to the nature of that presentation. I would point out one very interesting fact, and that is that prior to the plea agreement being entered into, Judge Gates had ordered a psychiatric evaluation of Mr. Davis to the extent of competency. I'm the first to concede that a competency evaluation, at least in Clark County, is not a full-blown psychiatric evaluation. I think they tend to be shorter. But between the competency evaluation that was done pre-trial or pre-plea and the detailed information that the R&R discusses on the mental health information that was placed in front of Judge Gates, I think Judge Gates, the record shows Judge Gates had a pretty good view of what Mr. Davis' mental health condition was. But, counsel, I guess I keep coming back to the same question, to read that report and then to have a lawyer advocating for that person, to stand up and explain why that might affect the sentence, why it should affect the sentence, why this person will be better served and society better served by getting them back out sooner and into the care of, well, you know the drill. But why wouldn't that have been likely to make some difference? Because I think, I'd say a couple of things. One reason the magistrate in this case found that it would not have, two things I think that are very salient to this case. Number one, the prior record of Mr. Davis. He had a lengthy history of domestic violence against his common-law wife, for a better term. He had prior felony convictions for carrying an incendiary device. This was a pre-planned attack. This was a horribly violent attack. He lured his common-law wife out into a desert area outside of Las Vegas. He, on the pretext of paying her some money that he owed her, shot her at point-blank range six times, left her for dead and left the area. What Judge Gates, the sentencing judge in Las Vegas, focused on in that hearing, knowing all this other information, knowing this defendant well because of both the psych evaluation that they had done for competency and all the information he had in the PSI report, what he focused on in that sentencing hearing was what he called the horrible, horrible crime that Davis had committed. And what he was focused on in my reading of the sentencing hearing that's in the EOR is the very violent nature, the pre-planned nature, the work that Davis had to go to to gather the tools, the gun, set up this plan to get his common-law wife out in this remote location outside of town, and then shoot her six times point-blank. This is a very, very violent crime, and I think that's what Judge Gates was focused on. It's essential, I think, in this case that this was a cap. This is not a standard kind of plea where the third count, the ex-felon in possession of a firearm, for example, was dismissed and all parties are free to argue. In that kind of case, I think you would have had a lot more argument. Caps are pretty rare in the Eighth Judicial District Court because the district judges don't like to have their hands tied with a cap. And it was pretty miraculous, I would argue, that Judge Gates accepted the cap, and I think what counsel was doing at that sentencing hearing, she was focused on one thing. She was successful in reducing Davis's exposure on the outside from 46 years down to 30. Keep in mind, he's going to be eligible for parole in about two and a half, maybe three years from now. So he's looking right now to his parole board hearing. Obviously, I don't know if he's going to be granted because of the violence of this crime, but he certainly can appear in front of the parole board. I believe it's in 2009. Judge Gates did not have to accept this plea. The way the cap was set, the way these things worked in this case and in other cases in the Eighth J.D., in the Eighth Judicial District in Nevada, is that if he didn't, if the judge had not accepted this cap and said, no, it's way too lenient because it's only for 30 years, and this is a very violent crime by somebody with a pretty bad past, they would have gone to trial. And so I think what happened, although I don't disagree. There may be a possibility counsel could have done more at that sentencing hearing, but we have to presume under Strickland that counsel knew what she was doing. She was on the track in Judge Gates' courtroom. But we know that she was incorrect in what she told the judge the stipulation was, right? I think she misspoke. I think she was talking about the cap. Not only that, but that mistake gets picked up by the Nevada Supreme Court. It was. I think the Nevada Supreme Court misspoke on the issue. So we have a lawyer misrepresenting accidentally what the agreement was in the Nevada Supreme Court, reiterating that as if it were a verity. What do we do about that? I think the stipulation that they're referring to specifically is the cap, although I agree with the court, and I agree with you, Your Honor, that that was not the complete agreement. I don't see that as an error as much as an incomplete analysis of what the agreement was. I would point out that it is our position that counsel was very successful and had done the vast majority of her work at the point that plea was entered because she had reduced that exposure. And I think we have to presume under Strickland that she knew because the victim survived in this case. This was not a defensible case as far as the crimes themselves. The only viable work that she had to do was on that sentencing issue. Doesn't that make it all the more essential to view the Strickland test in terms of the sentencing? In other words, in a case where all agree that there's not a defense to the crime, but everything hinges on sentencing, that would seem to make it even more important to do a correct analysis at the sentencing. I think the key issue here is that this was one of the pretty rare capped cases, and I think that counsel had done the vast majority of her work prior to the sentencing hearing when she got that agreement by reducing, again, from 46 years to 30 years, the exposure that Mr. Davis was going to get. Had they done the regular agreement, they would have gone in, maybe they would have dropped that 1-6, he'd be facing 40, they'd be free to argue. Davis had a guarantee that he was only going to be facing that 30 years. Right, but wasn't he entitled to counsel who would argue for 10 or 6 or 14 1⁄2 instead of 15? I think although counsel could have argued that, I think the reality here, and I think this is reflected in the report and recommendation, the reality is because this was a capped plea, as the report and recommendation found, and as federal habeas counsel for Davis recognized in the objections to the report and recommendation, there's just simply no showing that's been made. And counsel, I think, conceded this in his objections to the report and recommendation. When he said it's impossible to know if any difference would have been made. Because there was such a dramatic drop in that outward exposure because of this deal, the only thing, I shouldn't say the only thing, the focus of counsel at the sentencing hearing was to get the court to go along with that deal. And she was successful in doing that. Thank you very much. Mr. Carr, you've got about 45 seconds left. If you listen carefully to the State's presentation there, you'll have heard many times the State say I think, I suppose, I opine that defense counsel was thinking X, Y, and Z. Our contention here is let's find out. I asked it no less than three separate times at the district court level, federal district court level, for an evidentiary hearing. I'll note on page 161, I made my final pitch to the judge because once again, when I was being told that I had not yet proven that I could establish precedent, I'm just asking for a chance for a hearing to be able to prove it. Let's have an evidentiary hearing in this matter, find out what defense counsel was thinking, allow me to supplement the factual record with the full extent of mitigation evidence here, send it back, let the district court make a reasoned decision based on all the facts so we won't be up here speculating. So the relief you're requesting is remand for an evidentiary hearing in district court? Right, Your Honor, that's my primary basis for relief. I'll take the rate if you give it to me, but I believe I'm on further ground here asking for a remand to the district court for an evidentiary hearing on our claim. Thank you, gentlemen. Thank you. The case was started. You just submitted it. Good morning.
judges: Hall, Silverman, Graber